Thank you very much. We are here for a first for the history of this court, a Zoom and bank proceeding. We have every reason to believe this will go smoothly, but should there be a glitch, I want the attorneys to rest assured that I'm aware of the novelty of this and time adjustments will be made if necessary. And I also wanted to announce that between the opening argument for the appellant and when the appellees begin, we're going to take about a four or five minute pause just so that everybody can get themselves reorganized. But with those comments in mind, we have assembled today to hear the case of Henry against Hulett and others, case number 16-4234. And we are ready to begin with Ms. Brown. Ms. Brown He says would and may appeal to the court. Does any peer challenge a masked, stripped-back cavity surgeon during a net-scanning exercise to see where a corpse is to be taken, such as the side of hers in front of others? I'm afraid I cannot hear. It's a little choppy. Is there something we can do about that? It's very choppy. I'm not getting anything. Ms. Brown, why don't you start over again and perhaps it will help if you speak slowly too. Certainly. I should also tell you that I'm hearing a lot of feedback as well. She says would and may appeal to the court. Would plaintiff's peer challenge a masked, stripped-and-body-capped surgeon during a net-scanning exercise in which you are ordered to strip the patient, touch their own private parts, bend over, mask, manually strip the clinic... I don't think this is working. Can I make a suggestion? May I make a suggestion? I think if those of you in the courtroom muted yourselves as well, that might... We are muted here. The problem is a low-bandwidth connection from the attorney. Everyone is muted in the courtroom, so it's not the individual computers. Ms. Brown might be better off on audio only rather than audio and video, and then the bandwidth is not being challenged. I'm happy to try that. Should I turn off my video and try again? Why don't you do that? We'll reset the time, of course, as I said. Certainly. All right. Would you please reset the time? Chief Judge Wood. Chief Judge Wood and may it please the court. The plaintiff here challenged a mass strip-and-body cavity search during a set-panning exercise in which they were forced to strip naked, touch their own private parts, bend over, manually strip their buttocks, and display their vagina and penis in front of a wide audience of spectators, including youth. They had to stand on four contaminated-by-body toilets and bleed on themselves as well as others. And they had to endure degrading comments about their bodies and about their oaths that they were discussing. As the correctional director, Amita Singh, in this case, indicates, this exercise was far beyond the field in what is considered the appropriate way to change the test and how to conduct strip-and-body cavities. Ms. Brown, this is Judge Rosner. The Supreme Court gives an awful lot of deference to the judgment of prison officials when it comes to prison security. If, at trial, the warden credibly testified that the purpose of this search was a mass shakedown to check for contraband, should the manner in which the search was conducted be independently scrutinized? In other words, if the purpose was proper, should the warden have to go to trial on the issue of whether the manner was reasonable? Should every warden have to defend her particular practices? Well, two responses, Your Honor. First, to prevail on a Fourth Amendment claim in a prison context, the plaintiffs need to show that there was a substantially exaggerated response to any legitimate, penological purpose, and the defendants did not challenge that issue below. That was significant because the record is undeveloped, and many ways there have been takeaways on the purpose and perspective of that initiative. So, Ms. Brown, I'll just follow up on that question. If we look at the general statement of the Supreme Court in Bell v. Wolfish, the Court highlights four things that are relevant for Fourth Amendment challenges. The scope of the intrusion, the manner, the justification, and the place. And I'm wondering whether, given everything, given the context itself, you think that when allegations such as the ones here were made, the warden does need to come forward and say more than just, I run this prison and this is the way I thought it was most effective to accomplish. Yes, absolutely. The Court needs to look at whether there's an exaggerated response to the legitimacy of penological purposes. And importantly, on the Eighth Amendment claims, in that trial the jury was instructed that the Eighth Amendment required a finding in a plaintiff's paper only if the searches were conducted in a manner intended to humiliate psychological pain. The jury was not asked in the second question whether there was a legitimate penological purpose for the searches and whether the intrusion and the closure of a private body cavity and private bodily fluids was justified by that intrusion. Ms. Brown, this is Judge Taney. I wanted to get just a couple of basic facts on, apparently there were 200 women involved. Is that correct? We know that there were approximately 200 women involved. All right. And my next question is, how many corrections officers and cadets were involved? I believe there was something on the order of, you know, tours of cadets. There were a lot of correctional officers as well. I think maybe there were 60 cadets, 70 or 80 cadets. My colleague can probably give a better answer on that. What I was getting to is, what percentage of those were women? The entire cadet training exercise involved many men and many women. The strip searches were conducted by female cadets, but they were conducted in view of male correctional officers and male cadets that were in and out of the district. How long a period of time is the issue of violation, constitutional violation, do you believe? When did it start and when did it end? I believe it began at the beginning. It was a five to seven hour training exercise. And I believe that it began when the tactical officers stormed the housing unit, brandished the gun, and joined press. The searches were conducted in groups in the gym, but it took between five and seven hours for all of the strip searches to be completed. So your complaint involves more than just the strip searches themselves? Well, I think as the court indicated in Bell, the court needs to look at the manner of the searches. And the manner of these searches began with cadet professional officers rioting, brandishing the gun, and it ended at the end of the training exercise. The searches themselves were also very prolonged. They were lasted up to as long as 15 minutes, because these women were each naked. Thank you. This is Judge Saini. Ms. Brown, why would the manner of searches start from the time that they entered the facility rather than when the visual strip searches that are really at issue here took place? I think that the manner of the way that the searches were initiated goes to the reasonableness and the level of intrusion on the places. But even if the court were to look only at the times that the women were naked, there is ample evidence that the searches conducted in an objectively unreasonable and fading manner that was a substantially exaggerated response to any legitimate criminological purpose. And defendants did not challenge the law, and the record is undeveloped on the issue of the unreasonableness of the searches. So Ms. Brown, this is Judge Saini again. To pick up on what Judge Wood and Judge Rovner were asking you about the reasonableness or unreasonableness of the search, would you agree that that's something we would have to send back to the district court for development, that we could not make that determination on the record before the court? That is absolutely correct. There is critical evidence that is not in the record on this issue, including the contemporaneous emails of Gordon Hewlett and Gordon Reynolds about these specific strip and botch-up searches. And those emails and other evidence are not on the record before the court, and weren't submitted to the district court, because defendants failed to raise this challenge below. So the record is undeveloped on the issue, and it has to be that the court has prepared properly. Ms. Brown, this is Judge Rovner. We know from our experience on the court that prisoners sometimes secrete dangerous documents or contraband in body cavities. Given that the prison administrators have to address this security risk, what standard should apply to whether to search body cavities? Reasonable suspicion, probable cause, would a facility-wide shutdown of both body and cell be acceptable if the prison had a legitimate concern, but not to individualize suspicion about any particular prisoner? I'm setting aside the matter of the search for the moment. And what I'm asking you is, what standard do you suggest to justify a strip search in the first place? Well, the plaintiffs are not challenging here whether or not they can be strip and body cavity searched. Now, they concede that strip and body cavity searches in prison are typically appropriate when they're professionally conducted. So, you know, the plaintiffs believe that the Fourth Amendment standard requires us to show that the intrusion on their private body cavities, their private bodily fluids, was clearly more important than what is necessary to address any legitimate penological purpose. So this is Judge Wood. Ms. Brown, this is Judge Barrett. Go ahead, Judge Barrett. Some of our cases have expressed concern that permitting a Fourth Amendment claim in this context would do an end round around the Eighth Amendment. Can you address that, please? Yes, absolutely. Certainly, there are many complaints by prisoners about strip and body cavity searches that are perfectly all under the Eighth Amendment. But since the prisoners retain a basket of enumerated rights in prison, including the Fourth Amendment, the Eighth Amendment, the First Amendment, the right of personal protection, those are independent enumerated rights that serve different purposes and answer different questions. In addition to the case, the Fourth Amendment has a critical role to play in addressing strip and body cavity searches in rare cases such as this one, when the exposure of the private body cavities to bodily fluids of the plaintiff was conducted without a legitimate penological purpose. How could you? Without Fourth Amendment protection, a prisoner's body could be probed, inspected for evidence in whatever manner, however misguided and objectively reasonable, so long as there's no intent to humiliate. And of course, the unanimous holding that the Fourth Amendment has some role in addressing Fourth Amendment bodily searches, whether it's involuntary surgery or, as the panel below agrees, in a manual digital probe. The question is whether, opposed to this case, is there a reasonable expectation of privacy in private body cavity and private bodily fluids? And the answer to that question is yes, as nearly every other circuit has helped. So I just want to follow up on that question because it's certainly something that concerns the panel and has been discussed here. So you need to show, I think, that the privacy interests protected by the Fourth Amendment are not just a subset of the interests against cruel and unusual punishment and the like that are addressed by the Eighth Amendment. There could be instances in which privacy interests have been violated and yet, even wholly apart perhaps from the subjective part of the Eighth Amendment, there's no Eighth Amendment violation. I think the panel, at least, was interested in seeing what the different work that's being done by these two different specific constitutional provisions. I do understand your point that we're not talking about substantive due process here, so I think we can easily put that to one side. In terms of Venn diagrams, the Fourth Amendment and the Eighth Amendment need to be covering separate space. Yes, that space can overlap, but the separate space that they're covering is that the Eighth Amendment is addressing a cruel and unusual punishment. In other words, searches that are intended to humiliate and cause psychological pain. And the Fourth Amendment is answering a different question of whether, regardless of the subjective purpose, whether the exposure to the private body capacities and the private bodily fluid of certain searches was not justified by a phenological purpose. So you must be saying that the privacy interest, which obviously is quite limited for a prisoner, even in her body, the Supreme Court has never quite articulated what that was, but Hudson is about cells and property, but that the privacy interest might not be strong enough to protect her from a body cavity search period. You've conceded that, that the prisons can do that. That the privacy interest might at least address whether it needs to be done in private, whether it needs to be done by a same-sex officer, and those kinds of things. Yes, that's correct. In cases such as this one, where even the defendants say that their primary purpose was to train to death, there was a question about whether, under the facts of this case, there was legitimate phenological purpose for conducting certain body cavity searches separate from any intent to humiliate, punish prisoners. Is it your position that there's a question of fact on the purpose of the search? Because the state spent a lot of time saying that it was really just a mass shakedown. So what's your response? There is absolutely a question of fact. And the court should be aware that the record is undeveloped on this issue in critical ways. As I suggested, there are emails that are not in the record because the defendants didn't raise this issue below. And there's an email from Gordon Hewlett that says that the search is a last-minute addition to what was that training exercise that was planned to include just stealth. And that the strip searches specifically were requested by the training academy for the sole purpose of training to death. Conclaimant evidence shows that the training was unnecessary, that it was counterproductive. So this is an issue that has not been fully solved. And it's not before the court and the defendants to speak to it below. And it never raised the challenge to the reasonableness of the search. Ms. Brown, this is Judge Hammond. Can I ask you a question about the issue of qualified immunity? If we were to agree with you on the merits of your claims, you've raised the waiver argument in your brief. Are you arguing that qualified immunity was waived for purposes of this appeal or for the entire case? We are arguing both, Your Honor. I don't see how you can say that. Your theory seems to be that a defendant who fails to move for summary judgment on an affirmative defense thereby waives the defense. That can't be right, can it? Oh, no, Your Honor. Our arguments about waiver have to do with the fact that the defendant didn't plead their qualified immunity defense and mentioned the Fourth Amendment specifically in interrogatory responses about their affirmative defenses that they answered without objection. But regardless of the issue of waiver and perpetrator, this court should not consider qualified immunity because the plaintiffs have a claim for injunctive release to which qualified immunity does not apply. So consideration of qualified immunity by this court would not augment the need for a trial or a resolved appeal. Oh, sorry. Go ahead, Judge Hamilton. If I could just follow up briefly. Did you assert an individual capacity claim for damages against Warden Hewitt? Our seating on this was not perfect. However, the district court found below that the plaintiff sufficiently alleged individual capacity claims against Warden Hewitt. And that's not something that the defendant challenged across the field before this court. The district court found that we could proceed on an individual capacity basis against Warden Hewitt and allowed our Eighth Amendment damages trial to go through as well. Judge Barrett, did you have a question? Yes. Ms. Brown, your claim for injunctive release, will you have a liens problem with that? Is it as to the particular group of plaintiffs in this case? Is there reasons to think they'll be subjected to a strip search in the future? No. The district court certified an injunctive class of women who are incarcerated at Logan Correctional Center. And some of the plaintiffs remain incarcerated there as well. I think the question, though, is why do we think this is going to repeat? Do we have in the record indications from the state that they do strip searches commonly, regularly? We know from discovery in this case that there was a similar cadet training exercise in 2013 that was subject to similar complaints and led to litigation. As the district court found in its summary judgment order and the defendants failed to cross the field, the plaintiff's evidence that the IDOC's written policy differed from its actual practice, which the policy makers knowingly held out to the court to assert. The defendants make the division from this litigation that the searches were permissible and reasonable even under the facts as alleged by the plaintiffs. So upholding that the Fourth Amendment does not apply will only embolden them, and they will continue these practices. One particularly important issue for an injunction is that the summary judgment record indicates that there is no written policy on accommodating menstruation during a strip and body cavity search. And there was no training curriculum on this, even in the training curriculum for individual searches. So this is not adequate. There needs to be a plan for hygiene. There needs to be basement supplies on hand. There needs to be an adequate place to dispose of sanitary products during a search. There needs to be a clear direction on disposal. And that's an example of what we're seeking in this injunction. So what about the claims for damages? Do you have a good argument, given the fact that we all seem to agree that the law of this circuit, at least, pointed in several directions? How could it be clearly established as of 2011? Well, you know, in 2011, the appellate courts were unanimous, requiring that strip and body cavity searches of convicted prisoners be reasonable, including in this circuit. This circuit has so indicated in Forbes, and Sanity, Peckins, and Del Naine. And a subjectively reasonable officer would have known in 2011 and didn't have to open a case in order to know that he could not expect in it, obviously, a constitutional search in spirit. How do you get around Johnson on that argument? Because Johnson was decided by 2011. Johnson was quickly clarified by this court in Peckham. And in Peckham, the court claimed that strip and body cavity searches were subject to Fourth Amendment protection. Johnson, of course, was not addressed in strip and body cavity search. And it was addressing the far less significant viewing of plaintiffs in communal showers. So upholding that a plaintiff may not have a reasonable expectation of privacy when they take off their own clothes and enter a communal shower is entirely different from their privacy in the strip and body cavity search, where they have to reveal their private parts and their private body cavities. And Johnson, again, was clarified by Peckham. The court said that it was avoiding many other circuits that required Fourth Amendment searches of convicted prisoners to be reasonable. Ms. Brown, I'm just going to tell you that your time is down to seven minutes if you wanted to save your rebuttal time. It's up to you. Thank you. So if there are no further questions, I will reserve it. All right, so the court is now going to take, as I said, a four or five minute pause before we turn to the arguments from the state and general notes. All right, so are we all back in the courtroom where we are? OK, thank you. Thank you. All right. General notes, we will hear from you. Good morning, Chief Judge Wood, and may it please the court. Jane Notes on behalf of Defendant Ethel Eve. And may I ask at this point, can everyone hear me? It seems to me that you're OK. We will let you know if you start chopping up. OK. OK, thank you very much, Chief Judge Wood. Resolving the question presented by this case requires a two-step analysis. At the first step, the court must decide whether a Fourth Amendment search occurred, and if so, whether defendants are entitled to qualified immunity. Then at the second step, assuming the court reaches the second step, the court must decide whether plaintiffs presented sufficient evidence of summary judgment to establish that these searches were unreasonable as a matter of law. This morning, I am going to begin by explaining that plaintiff's argument falters at the first step, because a physical body cavity search of a convicted prisoner is not a Fourth Amendment search. Or if this court were to hold that it is, the court would be creating a new rule of law in this circuit, and defendants would be entitled to qualified immunity. Is it your position that visual inspection is never a search, or is there something about prisons or something that distinguishes this instance? So our position is that a visual inspection of a convicted prisoner's body is not a Fourth Amendment search. So are you then conceding that, say, for example, if a police officer stopped somebody on the street and commanded that person to take off his jacket and to turn his pockets inside out and to stick out his tongue and all of that, all done verbally, would that be a frisk of some type, a search? So if the circumstances that it happened in this case or happened in your hypotheticals occurred involving someone who was not a convicted prisoner, that would be a different question. And I believe that would be a Fourth Amendment search. Thank you. If we use a physical intrusion as the line for a search that qualifies for Fourth Amendment protection, would that mean that a cheek swab for a DNA test is protected, but a woman being forced to remove her own tampon in view of others is not? Which seems more intrusive to you? So I mean, I agree with the premise of your question that if a DNA cheek swab were taken, that likely would be a Fourth Amendment search from a convicted prisoner. There then may be an argument about whether it was reasonable. However, if a woman is asked to remove her tampon in the course of a swift search, that would not be a Fourth Amendment search. And the reason why we advocate this position, there are two reasons. The first is that the Supreme Court, in cases like Florence and Belle, have drawn a line between visual body cavity searches on the one hand, and body cavity searches that involve touching by someone else, such as a prison guard, on the other. But can I just interrupt there? Because the Supreme Court has discussed visual versus some kind of probing or touching. But my understanding is that it has done so in the context of this being a factor going to reasonableness, not a per se qualification. And I don't see quite as much in Florence as apparently you do. I don't think anyone disagrees that it's a factor. But to go to Judge Rodner's example, would you distinguish between a cheek swab where a guard did the cheek swab and one where you gave the swab to the inmate and you said, do it yourself? Are they different for Fourth Amendment purposes? Well, I think taking a cheek swab is different for Fourth Amendment purposes from a swift search. A cheek swab is much like a urine test or a blood test. And those types of incidents when you're talking about them happening to convicted prisoners are Fourth Amendment searches. And that's because a urine test, a cheek swab, a blood test can reveal so much more information about a person than a swift search. It can reveal much more than the presence or absence of condom band. It can reveal information about the state of the person's body. Does the person have a disease or an illness? Is the person pregnant? So for this reason, testing of bodily fluids or DNA testing, even when convicted prisoners are involved, is a Fourth Amendment search. Swift searches are very different. And that's because we know from Supreme Court cases like Hudson that, unfortunately, prisoners will hide contraband in their bodies as well as in their property. And what do you do? That is certainly all true. But what do you do with this? Much of your brief seems to be justifying the practice of strip searches. And I understand that the plaintiffs don't contest that at all. They say, sure, there's an institutional need for strip searches. But your position seems to be that you could take the inmate right out into the middle of the common room, strip her down right there, and find the contraband or not find the contraband or whatever, because your position doesn't have any limitation to where, how, who, anything like that. There's no limitation in our position under the Fourth Amendment. There is a very significant limitation under the Eighth Amendment. But in my hypothetical, the common room hypothetical, if it's just convenient, there's no ill will or malice or anything like that. Let's just take him out in the middle of the common room and strip him down right there. So I don't think that there's a perfect overlap here between the Fourth and the Eighth. We are not complaining there's a perfect overlap. We're not claiming there's a perfect overlap. But we do think that the overlap is significantly overstated by plaintiffs. Because even in your hypothetical, it's hard for me to imagine a circumstance in which a jury would not infer intent to harass and humiliate from a strict search done in a way that seems to serve no legitimate, phenological purpose. This is Judge Hamilton. I find that argument interesting but difficult to reconcile with the closing arguments made at trial, where the defendants emphasized the subjective nature of the Eighth Amendment inquiry. So that regardless of the objective circumstances, the defense always has the defense of the pure heart of legitimate purpose. Now, I would agree with you that if the circumstances are totally unreasonable, a jury might be able to infer. Malice or inappropriate purposes. But under the instructions and the arguments that were made, it's a purely subjective test. It is a subjective test. But I think that you are understating the inference that can be made of the intent to harass and humiliate under circumstances where there is no legitimate, phenological purpose for a search. And I think this court's precedence illustrates this point. In a series of cases, Calhoun, Whitman, May, May, the court has held that strict searches conducted in circumstances exactly the way plaintiffs alleged occurred here would, if the allegations were true, be an Eighth Amendment violation. So that includes strict searches accompanied by degrading language, strict searches in violation of department policy, strict searches with unnecessary cross-gender observation. All of this, if true, would be an Eighth Amendment claim. That would be permissible. General, I understand your point to the extent those cases indicate as a permissible inference. And a summary judgment for the defendants would be reversed, let's say, in those cases. But the defendants would still be at trial here. A legitimate purpose, subjective, is all that has to be decided. Yes, I agree with you that the argument is available. I think our point is simply that the gap in coverage is significantly less than plaintiffs suggest that it is, and perhaps may be close to being non-existent. How do you justify that argument with the direction given in Bell? Because Bell said when you're looking at reasonableness, certainly the justification for initiating the search is one of the factors, but it's not the only factor. You also have to look at the manner in which it's conducted, the place in which it's conducted, and the scope of the particular search. If the pediological purpose were the only aspect, they could have just said that, but it's not. Sure, so Bell, of course, is a step-two case. The court assumed without deciding that a Fourth Amendment search had occurred. So the analysis the court was performing in Bell was to question whether these searches were reasonable, not whether they were a Fourth Amendment search. We do agree that the types of factors you've identified are relevant to the reasonable analysis, but one first has to make the determination whether a Fourth Amendment search even occurred. Is it the state's position, then, that even a body cavity search isn't a Fourth Amendment search if done in a correctional institution? The state's position is that a body cavity search that does not involve touching by anyone other than the inmate, him or herself, in a correctional institution is not a Fourth Amendment search. So why is the touching of oneself so magic? It seems to me, as some of the amici pointed out, there could be instances in which maybe somebody wants to collect a sperm sample, and so you order the inmate, manipulating himself, to produce one. You don't think that would be an unreasonable search? I think that is a factual difference in the sense that we're talking here about strip searches and body cavity searches. You were drawing a line between one's own intervention with one's body. Now, this happens to be the women being told to perform certain steps that we all have repeatedly referred to. But I don't see where in the Fourth Amendment how people get their view makes such a difference. It even seems to me inconsistent with cases like Kylo that say there can be mechanical ways of enhancing your ability to observe. I just don't see that line in the Fourth Amendment. So what Hudson provides, and Hudson, of course, follows cases like originating with cats, is that to determine whether a Fourth Amendment search has occurred, so that's the step one inquiry, one has to assess whether there's been an invasion of privacy that society recognizes as reasonable. And one of the factors for making that determination in the prison context is society's interest in prison safety and security. And we know that identifying and deterring contraband is critical to ensuring prison safety and security. We also know that prisoners, unfortunately, will hide contraband on and in their body. What that means is that strip searches are, unfortunately, a fact of prison life. And if this court were to hold that a visual strip search is a Fourth Amendment search, what that means is that every time a strip search occurs, which will be often, prison officials and employees are potentially at risk of litigation over Fourth Amendment reasonableness. And we know that reasonableness is a very fact-specific inquiry. So that means that every one of these cases will go to summary judgment and perhaps even to trial. However, given the fact that at the end of today, prison officials and employees are given a significant amount of deference, those trials will usually result in a verdict for defendants. So what we'll end up with in this world is that there will be endless litigation over Fourth Amendment reasonableness at very little benefit to plaintiffs. Every other circuit, with the exception of the DC Circuit and the Federal Circuit, have found that the Fourth Amendment protects strip searches. And certainly, great deference is given to the jails. Are you seeing a flood of litigation in every other circuit? That's not what the case law suggests. Well, I mean, I think that that's something that's hard to know. I do think that the Supreme Court has recognized the importance of categorical rules, particularly in the Fourth Amendment context, because it is so fact-specific to reasonableness tests. But has any categorical rule ever distinguished in the Fourth Amendment context based on who's conducting the search? Well, you know, we draw that determination from the Supreme Court's opinions in Florence and Bell. And I understand Chief Judge Wood's point that that wasn't dispositive of those cases. But certainly, in the two cases, the Supreme Court has suggested that they recognize a material distinction between visual body cavity searches on the one hand and searches that involve touching by prison guards on the other hand. But that's a separate question than the question of who is conducting the search. You made a statement earlier that it would depend if the inmate conducted the search at the officer's direction versus an officer conducting the search. Is there any other Fourth Amendment jurisprudence that makes that distinction? So I'm sorry. Maybe I didn't state clearly our understanding of Florence and Bell. On our view, the inmate is being directed to participate in the body cavity search in both circumstances. It's just in one circumstance, they're being directed to touch themselves. And in the other circumstance, it's being done manually by somebody else. And we do think that that is a material difference, particularly given the Supreme Court's recognition that there is a difference there. And I think that recognition aligns with the common sense notice that it's simply more intrusive to be involuntarily touched by another person than it is to be directed to touch one's own self. Ms. Snopes, this is a dead broker. Why is a categorical rule needed for a planned non-emergency search, non-essential training purpose, such as the one that occurred here? What burden does it place on prison officials to conduct a strict search in an objectively reasonable manner? So I think that goes back to my point about categorical rules being important in the Fourth Amendment context and particularly in the prison context. Because without categorical rules, there is going to be endless litigation about the reasonableness of the search. But you know, one of the things the Fourth Amendment is notorious for is the lack of categorical rules. I can think certainly of Hudson, which says your home is no longer your castle if you're in prison. The prison guards can come in any time and search your cell. And we recognized only about three months after Johnson against Phelan was decided that that is all Hudson say. And I'm speaking of the Sparks decision. And so OK, fine.  in one's body. And the Fourth Amendment is just a heavily factually dependent part of the Constitution. The right of the people to be secure, unreasonable searches and seizures. And the Supreme Court has never said the Fourth Amendment doesn't apply inside prison walls. And I'd be very reluctant to be the first one to say that. So Judge Wood, I would like to answer your question. And then with the court's permission, I do want to move on to the qualified immunity questions. Because I see my time is running short. And I think it's important to talk about that. But let me answer your question first. I mean, so we recognize that Hudson did not decide the questions presented here. Hudson is about property searches. However, we believe that the two-step analysis that the court set forth in Hudson does dictate the same results here. And that is because search searches, unfortunately, but it's a practical reality, are a part of prison life, given the ever-present risk that prisoners will hide contraband not only in their property, but also on and in their bodies. And then I'll also point out that we are not urging that the Fourth Amendment doesn't apply at all in prisons. We understand this court's decisions in SPARC. Our position is that if there were a circumstance where a prisoner were involuntarily subjected to, say, a medical procedure for search purposes, or subjected to a suit for bodily cavity search that involves touching by prison guards, those would be Fourth Amendment searches. And they would be judged under reasonableness standards. But because search searches are so common in prison life, we believe a categorical rule is appropriate here. Now, I do want to, with the court's permission, talk a little bit about qualified immunity. Because the court's questions this morning have gone primarily to step one of the analysis. Is a visual body cavity search a Fourth Amendment search? And if the court were to now hold that it is, the court would be creating a new rule of law in this circuit, and defendants would be entitled to qualified immunity. Could I ask, in terms of the law in this circuit, what is the time you are advocating we should assess that as of? Today, or the time of King, or in 2011, when the officers acted, or something else? Sure. I mean, the way the qualified immunity analysis is usually applied is you look and see whether the law was clearly established at the time of the searches. And I think plaintiffs have used that to argue that King shouldn't even be considered. We disagree with plaintiffs about that. But even if this court didn't want to consider King's holding, the law available to defendants at the time included Johnson. And Johnson had held that prisoners retained no Fourth Amendment privacy rights at all. But that's not under the facts of Johnson. That's really not what Johnson said. Johnson says that in a professional setting where some general monitoring of people throughout the prison is going on under all the facts there, there was no Fourth Amendment violation. It made analogies to medical personnel who might see somebody in a state of undress and prison guards who were professional. And only, as I said, only shortly after Johnson we get Sparks, and then we get Peckham. So why does one take the broadest possible reading of Johnson when our own court had cabined it somewhat very shortly thereafter? So addressing Sparks, of course, was different facts. It was a forced medical leave. The court found qualified immunity there. Even there, on those more extreme facts. As for Peckham, I don't think that that court, that decision can be conceived as overruling Johnson. It certainly didn't support to overrule Johnson. No, I wasn't saying overruled. Understanding the context, really. What was going on in Johnson? I don't think there's necessarily anything wrong with Johnson. It's just how far do you take it beyond its own facts? Well, I mean, I think looking at Johnson, for purposes of the qualified immunity analysis, the appropriate part of Johnson is not the particular fact of the case. That's not what the qualified immunity analysis looks at to determine whether law is really established. And I would say the combination of Johnson and Peckham, at worst, show that this court's precedents were pointing in opposite directions. And that's, in fact, what the court recognized when it decided King. When it decided King, the court said, Johnson, maybe that was a little bit too broad. But the law is certainly not what Peckham suggested it was. And so King explains that reconciling this court's precedents, the proposition this court's precedents stand for is that a visual inspection of a prisoner's body, and recall that in King, the court described the inspection as an unusual and unreasonable form of prolonged strip search, that type of conduct was not a Fourth Amendment search. Instead, complaints about that type of conduct had to be addressed under the Eighth Amendment. So our view is that even if this court were to reject our arguments on step one and determine in the first instance that a visual body cavity search in this circuit is a Fourth Amendment search, defendants are entitled to qualified immunity. And I'll just touch briefly on King's case. Can I ask what you do with the injunction part of this? Because a great deal of your brief is devoted to the proposition that strip searches are just a regular, ongoing part of life in prisons. And so taking the lion's lens, to which Judge Barrett referred a little while ago, it sounds like there's every reason to believe that the people who are still inmates are going to be subjected to many other searches, searches that don't have any of the limitations that the plaintiffs believe are appropriate, where as long as you're self-manipulating, it's fine. So we have that. And then if you could talk about qualified immunity for the subclass of people who are not in prison anymore and for the injunctive people, that would be good. OK, so qualified immunity, of course, is immunity from damages. And it is available to government officials who are sued in their individual capacity. And it is immunity from the burdens of suit and also the immunity from the burdens of trial. So this court should, regardless of its view availability of injunctive relief, find that the many defendants who are sued in their individual capacity are qualifiably immune. Now, with regard to the injunctive piece, our view is that there is not sufficient evidence and records to warrant moving forward on injunctive release. If this court disagrees, that's certainly something that can be vetted in the district court. So can I just interject there? When you're talking about evidence in the record, I want to get to the plaintiff's waiver point. Because to put it mildly, the state certainly wasn't fronting the issue of qualified immunity. There are good arguments that it was at least forfeited, if not waived. And precisely the record that you're complaining wasn't developed would presumably have been developed. It would have given the district court a chance to allow this issue to be fully vetted at the district court level. So it's a little difficult to push too much on the record here. Well, I was talking about further development of the record with regard to the availability of a necessity for injunctive relief. I don't think any development of the record is needed on the qualified immunity issue. But I guess I'd like to address your point in two parts, because you referred to forfeiture and waiver. And they are, of course, two different things. Waiver requires intentional relinquishment of a known right. It's usually demonstrated by an express statement to that effect. Defendants at no point expressly stated they were abandoning qualified immunity. Every time they mentioned qualified immunity, it was in the context of preserving the argument. They included it in their answers. They included it in their interrogatory responses. But you never raised it in response to the summary judgment motion. So why isn't that waiver for purposes of the summary judgment appeal? And I'm just going to add, particularly because this is a civil case, I think it's interesting to, we don't always quickly import waiver and forfeiture concepts from the criminal law over onto the civil side. I mean, my understanding is that the waiver rules would still, in the civil context, require an intentional relinquishment of a known right. But maybe then I'll just talk about the summary judgment motion and the forfeiture issue. I mean, this court may determine that it was forfeited, the argument, because it was not in the summary judgment motion. But this case does not present any of the reasons why a court should enforce a forfeiture. And I think you were alluding to some of them, who said would. I mean, one of the usual reasons is because not enforcing the forfeiture might harm the plaintiff. There's no harm to plaintiffs here from addressing the qualified immunity issue for the first time in this court, because there is nothing that could happen on remand in terms of development of evidence or argument that would improve plaintiff's position on qualified immunity. They've never identified anything, and they can't think of anything. And then it wouldn't injure the district court either if this court were to address qualified immunity now. And that's because the district court wasn't required to address any arguments it wouldn't have otherwise addressed had defendants included qualified immunity in their summary judgment motion. And that's because, and I think this is plain on the face of the district court's opinion, the district court was and the district court felt compelled by this court's prior precedence to reject plaintiff's Fourth Amendment claim on the merits at the first step. So any inclusion of a qualified immunity argument likely would have been extraneous. My guess is that had it been included, the district court wouldn't even have addressed it, or if the court addressed it, anything the court said would have been fixed up. So. If I ask one, the leader of the chief, I'd like to ask one quick additional question. Sure. General notes about it. You raised at the outset of your argument, and haven't gotten back to it, whether the plaintiffs proved that the manner of the searches was unreasonable in opposing summary judgment. I understood the defense to have argued in the district court, quote, the nature of the searches and whether they were conducted in the manner claimed by plaintiffs are clearly in dispute. And those were issues that were not raised in the summary judgment. And in fact, defendants objected and moved to strike when plaintiffs did seek to interject those issues, which were never addressed by the district court. So do you think we, given that history, could we try to address the issue of reasonableness on this record? So this court can, of course, affirm on any grounds supported by the record in the law. And we think that we may do so if the plaintiffs had an opportunity to respond. And they're not required to respond to issues we don't raise in the summary judgment, right? So if this court were to reach step two reasonableness, and that means that the court would have rejected our merits arguments on step one, as well as our qualified immunity argument, we do believe that, and the court were uncomfortable with resolving the step two issue having been vetted in the district court. We believe that an appropriate resolution would be to remand to the district court. We do believe, though, that defendants should be entitled to file a subsequent summary judgment motion raising that step two reasonableness argument. And because it is very fact specific, we recognize that, so that it could be fully vetted in the district court. However, we don't believe that that sort of recourse is necessary with regards to the qualified immunity argument, because we believe that there is nothing that could happen in the district court that would improve plaintiff's position with regard to qualified immunity, nor is there anything that could happen in the district court that would inform this court's decision with regard to qualified immunity. Because if this court is going to hold that a visual body cavity search is a Fourth Amendment search, the qualified immunity question will be straightforward. And if the court needed any further confirmation of that point, the court need only look at the proceedings in this case. Three of the four judges who have looked at this case have held that a visual body cavity search is not a Fourth Amendment search. We need to wrap up now. So if you would like to just finish up. Sure. I'll just finish that thought. My point is on qualified immunity, three of the four judges who have looked at this case have held that a visual body cavity search is not a Fourth Amendment search. The district court judge and the two judges in the panel majority. And even the panel dissent which would found the Fourth Amendment search recognized that this court's prior decisions on the topic that were available to defendants when this mass shakedown occurred, that the court's decisions were irreconcilable and inconclusive. All right. Thank you very much. OK. Thank you. All right. So we will now hear from Ms. Brown again. And our clock shows that we have approximately seven minutes. Thank you. Four points, Your Honor. First, defendants offered no principled basis to draw a Fourth Amendment line as a manual clothing by the district official. It is unchallenged that the plaintiff's teacher or quarter touched their own private parts under threat of discipline. Their bodies were essentially commandeered by a searching official. And the identity of who this is touching, while strictly going to the level of intrusion of the search, does not dictate whether a Fourth Amendment search occurs. Second of all, the defendants offer no principled basis for concluding that women in prison have no reasonable expectation of privacy and dignity in searches of their private body properties and their private bodily fluids, neither of which were at issue in Johnson and King. That conclusion cannot be shared with the jurisprudence of the unanimous jurisprudence of the court's sister circuit, nor can it be shared with the unanimous jurisprudence of courts addressing frigid body-cabin searches of pretrial detainees who are subject to the same conditions and may pose similar security challenges, and the interest in searching them to the contrary is equivalent. The defense system suggested that our rule is somehow unworkable. That is not the case. Now, the plaintiffs are asking the court to find that frigid body-cabin searches must be feasible under the Fourth Amendment, and there is no evidence that that rule has been unworkable in any other circuit. So can I just ask to clarify, Ms. Brown, once more just to nail this down, you are not saying that there's something about this type of search for convicted inmates is a problem. Your argument seems to be a scope and manner and justification kind of argument. Had this been done in accordance with all of the written standards that Lincoln and now Logan has, you wouldn't be here. Is that correct? That's correct. That's correct. And any search searches that look anything like the searches conducted in Bell or the searches conducted in Florence are reasonable as a matter of law. It's only a recent situation, such as this one, that the plaintiff will be entitled to a trial on a Fourth Amendment claim involving a frigid body-cabin search. On the issue of qualified immunity, just two points. First, the defendant suggested that it doesn't matter that we didn't have an opportunity to develop at the soil, he strenuously disagrees. Had we had the chance to read this, we could have put in additional facts that would defeat qualified immunity, such as facts showing that the searches were an obvious violation of the plaintiff's constitutional rights, and that the defendants were on notice of the unconstitutionality of these searches. But we have not had a chance to put into the record facts such as the number and proximity of the male sex care to the searches, the absence of the security needs from ill-doing, conduct of the tactical team officers in the gym, or the defendant that they knew that conduct as alleged by plaintiffs was unconstitutional and not allowed. Our case is an easy case for a search. Unlike the searches in Johnson and King, the plaintiffs were required to expose their private body copies and their private bottled fluids. And there is no recording that suggests that women in prison did not have a reasonable expectation of privacy in those very private spheres of their bodies. So are you saying the record does not show what the spectators were to the women during the strict part of the incident? That's correct. The record shows that they were in the gym. But we didn't have the opportunity to show how close they were. And the defendants have tried to use that against us to argue that, well, they were really far away. That's not the case. And we didn't have the opportunity to put contrary evidence into the record. Ms. Brown, would those facts that you just identified that you would want to develop for qualified immunity be relevant to the initial question of the application of the Fourth Amendment in the first instance versus the reasonableness of the search? They go to the second part of that analysis. But on the first part of the analysis, I think every instance of the search is important. I'm sorry. I'm sorry. Ms. Brown, are you still there? I'm here, yes. Can you repeat that, please? Yeah, maybe you better repeat that. We had some interference. Yes. The evidence that I was describing goes to the succeeding qualified immunity on the issue of reasonableness. On the first part of the inquiry, whether strip and body cavity searches had to be reasonable in the first place, all of the court's decisions on strip and body cavity searches have held, by the time of these searches, that the strip searches had to be reasonable. Johnson was not addressing the searches of body cavities at all. And either was King, who supports both state-of-the-art searches. There was also unanimity in the appellate court on this issue. Every other circuit has held that strip and body cavity searches had to be reasonable. And in Bell, the court concluded, when grouped together, pre-trial prisoners and consensual prisoners. And if the search was much reasonable, the abuse would not be condoned. All right. Would you like to wrap up, Ms. Brown? Certainly, Your Honor. The defendants failed to identify any principle basis for drawing a line at a manual probing by a search official on considering strip and body cavity searches, and whether they have to be tested under the Fourth Amendment. You know, the defendants also failed to identify any principle basis in constitutional law to subjugate the enumerated Fourth Amendment rights to the dependent, host, or distinct Fourth Amendment rights of the person. For that reason, we ask that the court reverse the district court and remand for plaintiffs to their Fourth Amendment rights. All right. Thank you very much. Thank you, as well, to General Notes for the state. And this court will now take the case under advisement, and we will be in recess.